**MOORHEAD CONSTRUCTION CO., INC., a corporation, Appellee-Cross-Appellant,**

v.

**CITY OF GRAND FORKS, a Municipal Corporation, Appellant-Cross-Appellee.**

Nos. 74–1216, 74–1234.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1974.

Decided Jan. 3, 1975.

John D. Kelly, Fargo, N. D., for appellant-cross-appellee.

Gordon Caldis, Grand Forks, N. D., for appellee-cross-appellant.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and WEBSTER, Circuit Judge.

GIBSON, Chief Judge.

In this court-tried diversity case, the plaintiff Moorhead Construction Co., Inc., recovered a judgment of $109,994.26

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

for breach of contract. A counterclaim of the defendant City of Grand Forks, North Dakota, was dismissed with prejudice. In its original complaint Moorhead, a Minnesota corporation, sought $125,000 in extra expenses and lost profits incurred in performing a contract with the City to build a sewage treatment facility.

The City had divided the construction project into two phases, each to be performed by separate contractors. Phase I was designed by the City's own engineering department and covered primarily the earth work and site preparation for four aerated-anaerobic treatment ponds, including installation of piping and appurtenances such as foundations for compressor and meter buildings. The four ponds or earthen cells were to be formed by building earthen dikes or embankments in a square pattern divided into four large, square, water-tight sections. The phase I contractor, Valley-Mayo, was scheduled to complete its work in September, 1969, before phase II was to commence. The phase I contractor, however, did not substantially complete its contract until November, 1970. The final acceptance by the City of the phase I work was not until October, 1971, when the contractor was paid in full and discharged.

Phase II of the project was designed by Richmond Engineering, Inc., of Grand Forks, the City's agent and supervisor for the project. It consisted of completing the buildings, constructing manhole installations and access bridges into and over the ponds, and installing all electrical and mechanical equipment. When completed, the aeration equipment would treat the City's sewage primarily in the aerated cells; secondary treatment would occur in lagoons. The separate phase II contract was awarded to the plaintiff Moorhead in July, 1969, with completion scheduled for October 30, 1969. Its accepted bid was $409,333.00. However, due to adverse weather, soil conditions, and delays, which are the subject of this litigation, phase II was not completed until November, 1971, and the facility commenced operations in January, 1972.

Moorhead posited two bases for recovery: (1) "changed conditions" requiring an equitable adjustment of the contract price under a clause contained in the contract, and (2) the City's alleged breach of the contract by delay and failure to prepare the construction site as warranted. The City counterclaimed for liquidated damages due to delay and faulty work. The City's appeal contests the District Court's findings as to liability and its assessment of damages. Moorhead cross-appeals for lost profits which the court refused to award.

As an initial point on appeal, the City challenges the District Court's July 25, 1973, grant of summary judgment on the City's third party complaint against the phase I contractor, Valley-Mayo. Although Valley-Mayo has apparently not been fully joined as a party to this appeal, the issue of the propriety of the judgment is properly before this court.[1] The grant of summary judgment

---

1. Plaintiff Moorhead's assertion that the City should have appealed the order of dismissal in 1973, and that its present appeal is therefore untimely, is without merit. An order dismissing a third party complaint which does not contain certification by the District Court that "there is no just reason for delay," Fed. R.Civ.P. 54(b), is not a final and appealable order. Woodby v. Chesapeake & O. Ry., 345 F.2d 668 (6th Cir. 1965). In the instant case the District Court granted Valley-Mayo's motion for summary judgment on the City's third party complaint and directed that judgment with prejudice and with costs be entered in Valley-Mayo's favor, but made no express determination of finality releasing the

decision for appellate consideration. Thus, had the City attempted to appeal the order in 1973, it would have been dismissed for lack of jurisdiction. Gallon v. Lloyd-Thomas Co., 261 F.2d 26 (8th Cir. 1958); see Lockwood v. Hercules Powder Co., 172 F.2d 775 (8th Cir. 1949). Moreover, the failure by an appellant "to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for such action as the court of appeals deems appropriate, which may include dismissal of the appeal." Fed.R.App.P. 3(a). Thus, even if the City is responsible for failure to join Valley-Mayo as a party to the instant appeal—by failure of service or otherwise—the

pursuant to Valley-Mayo's Rule 56 motion was based on the court's holding that there existed no issues of material fact to be decided to determine Valley-Mayo's liability to the City, and that the City was entitled, as a matter of law, to no relief. Fed.R.Civ.P. 56(c).

■ A review of the record indicates that the court's factual findings are supported by the record and are not clearly erroneous. They are entitled to affirmance. Fed.R.Civ.P. 52(a). The only issue of law essential to the dismissal was whether, in the event Moorhead successfully recovered from Grand Forks, the City could in turn recover against Valley-Mayo under the phase I contract's one-year "hold harmless" indemnity bond. The fundamental principle of third party practice is that in order to maintain a third party complaint, a direct line of liability must be alleged to exist between the third party plaintiff and third party defendant independent of that between the first party plaintiff and defendant. 6 C. Wright and A. Miller, Federal Practice and Procedure § 1442 at 206 (1971); Fed.R.Civ.P. 14(a); *cf.* United States Fidelity & Guaranty Co. v. American State Bank, 372 F.2d 449, 450 (10th Cir. 1967). Thus, the City's arguments that Moorhead's claim actually rests on delays and changed conditions caused ultimately by the phase I contractor, Valley-Mayo, and not by the City, are of no avail. The causal relationship is of no avail to the City if the legal basis for indemnity between it and Valley-Mayo has been terminated. The City previously had accepted Valley-Mayo's work and discharged it from further obligations under its contract, without reserving any claims. Absent fraud or latent defects, the City thus waived any rights against Valley-Mayo which may have arisen because of delay or on the performance bond. 5 Williston on Contracts § 724 (3d ed. 1961). Valley-Mayo's obligations to the City were discharged by the contractor's acknowledged full and exact performance. 5A

court need not dismiss the appeal on this issue for that reason. Further, the common questions of fact relating to both phases of

Corbin on Contracts § 1230 at 510 (1964). The District Court's order dismissing the third party complaint against Valley-Mayo with costs is affirmed.

■ The City's various assertions of error challenging its liability for Moorhead's extra costs are essentially challenges to the District Court's findings of fact intertwined with contract interpretation. On appeal this court is not authorized to conduct a *de novo* review of cases tried without a jury. The District Court's findings must be sustained if not clearly erroneous. Fed.R.Civ.P. 52(a); Brown v. Scott, 454 F.2d 693, 694 (8th Cir.), cert. denied, 409 U.S. 846, 93 S.Ct. 50, 34 L.Ed.2d 86 (1972). The District Court based its finding of contract liability upon the "changed conditions" clause, and the City's breach of an implied warranty that the site would be prepared and the soil compacted in accordance with phase I specifications.

■ At the time Moorhead bid on the phase II contract, the phase I earth work had just commenced. Because an inspection of the site by Moorhead would not then have disclosed the difficult site conditions which it would later face due to excess moisture and lack of compaction, Moorhead in estimating its bid necessarily relied upon the City to provide a construction site prepared in accord with the specifications of phase I. Those specifications, according to the District Court, called *inter alia* for 90% compaction of the soil embankments and cell bottoms. The court construed the phase I compaction specifications as implied warranties in the phase II contract. Construction of the contract is a matter for the court under North Dakota law. Eickhof Construction Co. v. City of Grafton, 123 N.W.2d 580, 584 (N.D.1963); Anderson v. First National Bank, 6 N.D. 497, 72 N.W. 916, 920 (1897), aff'd, 172 U.S. 573, 19 S.Ct. 284, 43 L.Ed. 558 (1899). The City's assertion that phase II did not embody the phase I soil compaction specifications is without merit,

the construction project reduce the court's need for an appellee's brief from Valley-Mayo.

and the court's interpretation of the contract is correct.

The court's findings as to the delays and the deficiencies in soil conditions which the City permitted are fully supported by the record. Moorhead was not given access to the site to begin its phase II work until January, 1970, two months after its work was originally scheduled to be completed.[2] Moorhead suffered additional delays from the unanticipated necessity of performing in the winter months, not contemplated by the contract, and from the soft soil conditions which required slower construction methods and increased footings.

Before January, 1970, when Moorhead was notified to proceed, its president inspected the site and refused to take responsibility for it.[3] The bottom surface of the lagoon cells was extremely soft. As a result of the unstable soil conditions actually encountered in the cell bottoms and on the embankments Moorhead was forced to work by different, more expensive methods without heavy equipment. Most of the foundation footings for the mechanical installations and access bridges had to be redesigned and spread apart for greater support. Moorhead does not claim that it had to redo any of the phase I work, nor is it demanding damages resulting solely from phase I delays. Its claim is that its phase II job was entirely changed and greatly increased in cost; it therefore demanded an equitable adjustment of the contract price pursuant to the contract's terms.[4]

---

**2.** The phase I work which was commenced in May, 1969, was scheduled to be completed on September 1. However, because of soft soil conditions encountered by the phase I contractor, work was suspended, with City approval, from May 30 to November 1. After November 1 the soil was again frozen hard enough to accommodate heavy earth moving equipment. The City then extended the completion date until one year later, October 1, 1970.

**3.** The appendix prepared by the District Court to supplement its memorandum opinion discloses that as early as December 2, 1969, Moorhead "expressed concern about increased costs related to the delay * * *." On December 19, 1969, Moorhead wrote to the City:

> I am very deeply concerned and perturbed in regards to the contract we hold with the City * * *. We bid the project under certain stipulations * * * we had to follow and time limits to be adhered to. As of this date we have not even been given access to the project.
>
> * * * * * *
>
> * * * I went to inspect the project site and I definitely would not accept accessibility to the site and be responsible for it in its present condition. * * * We are going to incur additional costs, as to increased labor, material, sales tax, warehousing and scheduling material shipments and placement of our crews to complete this project.

**4.** In pertinent part, the contract reads:

> F–20. CHANGED CONDITIONS. Should the Contractor encounter or the Owner discover during the progress of the work *subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract, the Engineer shall be promptly notified in writing* of such conditions before they are disturbed. *The Engineer will thereupon promptly investigate the conditions and if he finds they do so materially differ and cause an increase or decrease in the cost of, or the time required for performance* of the contract, an *equitable adjustment will be made and the contract modified in writing accordingly.*
>
> F–21. EXTRA WORK. The Contractor shall perform unforeseen work, for which there is no price included in the contract, whenever it is deemed necessary or desirable in order to complete fully the work as contemplated. Such work shall be performed in accordance with the specifications and as directed, and will be paid for as provided herein.
>
> * * * * * *
>
> F–22. ORAL AGREEMENTS. No oral order, objection, claim or notice by any party to the others shall affect or modify any of the terms or obligations contained in any of the Contract Documents; and none of the provisions of the Contract Documents shall * * * be held to be waived or modified by reason of any act whatsoever, other than by a definitely agreed waiver or modification thereof in writing, and no evidence shall be introduced in any proceeding of any other waiver or modification.

The City contends that Moorhead is precluded from employing the changed conditions clause because it failed to take the steps required to bring the clause into operation. The District Court found, however, that Richmond Engineering, as agent for the City, had determined that changed conditions did exist and that failure to carry the administrative process to a final written contract modification was chargeable to the City's neglect, not to Moorhead's. The record supports the conclusion that the City waived its rights and is now estopped from denying Moorhead an equitable adjustment under clause F–20. Van Nice v. Christian Reformed Church, 59 N.D. 564, 231 N.W. 604, 607 (1930).

Specifically, the District Court found that the City's failure during phase I to exercise its authority either to alleviate the soft soil conditions by employing a lime drying additive or to supervise the phase I work more closely had the effect of saving the City money but inequitably shifted the extra costs to Moorhead. Moorhead promptly gave the engineer notice after discovering the changed conditions.[5] The engineer, in turn, notified the City,[6] inspected the site, and concluded that changed conditions did exist.[7] Eventually, the engineer and Moorhead redesigned nearly every major footing in the project's structures.[8] The District Court properly found liability predicated on changed conditions and breach of implied warranty as to site preparations in accordance with phase I specifications.

The total expenses incurred by Moorhead, as determined by the trial court

F–23. AUTHORITY OF THE ENGINEER. *The Engineer will decide all questions which may arise as to the quality and acceptability of* materials furnished and *work performed and* as to the rate of progress of the work; *all questions which may arise as to the interpretation of the plans and specifications; all questions as to the acceptable fulfillment of the contract on the part of the Contractor.*

\* \* \* \* \* \*

1–06. THE ENGINEER
 a. The Engineer shall have general supervision of the work as the agent of the Owner. He shall have authority to direct the construction insofar as the proper execution of the contract is affected.
(emphasis added).

5. On February 17, 1970, Moorhead wrote to Richmond:

 It is very difficult to construct a job under existing information and complete the same when the conditions and time of availability are not the same as stated under the bidding plans and specifications.

 According to the specifications of Phase I, the bottom and slopes shall have 90% compaction. This definitely is not there. \* \*

6. On February 18, 1970, Richmond, relaying Moorhead's letter to the City, stated:
 As we all know, the soil conditions at the site are treacherous. It is entirely possible that 90% compaction by the Phase I Contractor was a physical impossibility considering the time of year the work was done.

7. On March 23, 1970, Richmond wrote to the City:
 In discussing the unstable soil matter with Moorhead, they again noted the soil conditions were beyond their control and that they bid the job under the premise that the Phase I Contractor would obtain 90% compaction in the cell bottoms and dikes. Since the dikes are not completely finished and are still frozen it is probably too early to comment on their density, but *the bottoms are definitely a changed condition.* (emphasis added).

8. Richmond's March 23, 1970, letter to the City continued:
 Our own design has suffered from this unstable condition. \* \* \* [W]e are now faced with a spread footing design pressure only some 15% of that used under anywhere near normal conditions.

\* \* \* \* \* \*

 The Phase II contractor is making the best possible effort to prosecute the construction. He has been hampered not only by the soil condition, but also by not having the [building foundations] turned over to him.

 In short, we do not feel he is being at all unreasonable in disclaiming responsibility for the existing soil conditions.

were $537,934.58.[9] The court, however, could not determine precisely which of Moorhead's additional expenses were caused by the City's breach of warranty and which were due to changed conditions calling for equitable adjustment of the contract price under clause F–20. Consequently, the court applied the total cost theory and awarded Moorhead $109,994.26, the difference between its actual expenses and the City's payments. All of Moorhead's expenses were found to have been fully documented and reasonably incurred.

The City contends that the court erred in finding that Moorhead's damages were impossible of exact causal determination and in awarding Moorhead the full difference between its expenses and receipts. It argues that extra costs directly attributable to the City's alleged breach, if any, have already been paid, and that Moorhead's extra expenses are attributable solely to its own cost-overruns for which the City is not responsible. Moorhead cross-appeals for an additional award of profits, arguing that because its total cost figure of $537,934.58 represents actual expenditures, it recovered no profits whatever for the time consuming project.

■■■ In the court below, Moorhead presented its case premised on the combined theories of breach of contract and equitable adjustment under the contract's own terms. It chose not to order its proof so as to show which damages were caused by the City's breach and

which were caused by changed conditions. Consequently, the court awarded Moorhead judgment without separating the two theories. It is confusing, however, for us to evaluate the District Court's award which rests upon a combination of two theories, that of equitable adjustment under the contract for changed conditions and damages for its breach. As it was Moorhead's duty to prove which extra expenses were attributable to the breach of contract and which were attributable to changed conditions and it failed to do so, we are without a basis in the record to attempt to separate the award when the District Court could not.

■■■ The essential factual determination which nevertheless remains clear is that the City, rather than Moorhead, is solely responsible for all of the extra expenses. Even if the trial court's findings as to the specific causes of the damages were more clearly delineated, this court could not alter them unless it found them to be clearly erroneous. On the contrary, in light of the circumstances, we believe the damages were fairly assessed.

■■■ In its memorandum opinion, the District Court, speaking in terms of awarding damages for breach of contract,[10] relied on a Court of Claims case, J. D. Hedin Construction Co. v. United States, 171 Ct.Cl. 70, 347 F.2d 235, 259–260 (1965), for the proposition that profits will not be awarded on the amount of damages arising from breach of

9. Moorhead's Actual Expenses according to the exhibits:

| | |
|---|---|
| Labor & Materials | $342,579.81 |
| Subcontracts | 133,052.77 |
| | $475,632.58 |
| (Less $200 disallowed by District Court) | 200.00 |
| | $475,432.58 |
| Plus overhead | 62,502.00 |
| | $537,934.58 |
| Actual payments made by the City | 427,940.32 |
| Balance | $109,994.26 |

10. The award of damages in this diversity case is governed by North Dakota law, re-

gardless of the theory used to support it. In North Dakota, when the contract is silent as to the measure of damages for its breach, the statutory rule prevails. Russell v. Olson, 22 N.D. 410, 133 N.W. 1030, 1033 (1911). N.D. Cent.Code § 32–03–09 (1960) provides that:

For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by the laws of this state, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary course of things would be likely to result therefrom. No damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin.

contract.[11] When the evidence specifically links damages to a breach of contract, however, *Hedin* does not bar an award of reasonable profits if they are calculated as part of the original contract price; *Hedin* bars only those which might be calculated on the excess damage award. *Hedin, supra* at 259–260. Moreover, apart from the question of contract damages, profits can properly be included as one of the elements of an equitable adjustment pursuant to the contract's terms. *Cf.* United States v. Callahan Walker Construction Co., 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942).

 Whether the District Court did, in fact, include an allowance for original contract profits in its award to Moorhead is not entirely clear. If the court awarded them as part of damages for breach, it did so properly; and if it did so as part of an equitable adjustment, the court's finding is not subject to revision by us. Likewise, as a discretionary matter, the court could properly have denied Moorhead profits altogether. Included in Moorhead's claim of total expenditures of $537,934.58 is an item of $62,502 for overhead. That item was allowed by the court in full. If the modest 5% profit demanded now by Moorhead were also granted, calculated solely on the basis of the original contract price, the profit alone would amount to $20,466, which, when added to the net judgment of $109,994.26, would yield $5,460 more than Moorhead's original pleaded demand of $125,000. Obviously, neither we nor the District Court should award Moorhead more than it demanded in its complaint.

 We are inclined to accept the District Court's evaluation of the damages unless it can be shown that clear error was committed in applying a particular rule of damages. No such showing has been made here. While the total cost theory utilized by the District Court is not a preferred method for calculating damages, its use was justified by the circumstances of the instant case. As a practical matter, the court found that no other method was feasible and that the supporting evidence was substantial. As a guide, the Court of Claims has stated that:

> The acceptability of the [total cost] method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.

Urban Plumbing & Heating Co. v. United States, 187 Ct.Cl. 15, 408 F.2d 382, 394 (1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970), *quoting* WRB Corp. v. United States, 183 Ct.Cl. 409, 426 (1968). *See also* Great Lakes

This statute restates the common law rules that compensation is recoverable for all detriment naturally and proximately caused by the breach, Hayes v. Cooley, 13 N.D. 204, 100 N.W. 250 (1904); Needham v. H. S. Halverson & Co., 22 N.D. 594, 135 N.W. 203, 204 (1912), and that the party claiming special damages has the burden of showing that his loss was reasonably within the contemplation of the parties, as a probable result of the breach, when they entered into the contract. Hadley v. Baxendale, 156 Eng.Rep. 145 (Ex. 1854); *accord* Bumann v. Maurer, 203 N.W.2d 434, 440 (N.D.1972).

An award of equitable adjustment on the contract is a mixed question of fact and contract interpretation. Factual findings are not to be overturned unless clearly erroneous, Fed.R.Civ.P. 52(a), and contract interpretation is a matter for the court under North Dakota law. Eickhoff Construction Co. v. City of Grafton, *supra*; Anderson v. First National Bank, *supra*.

11. In *Hedin, supra* at 259–260, the Michigan contractor requested profits of 10% on certain excess costs attributable to the Government's breach of contract. The Court of Claims granted the excess costs, without the excess profits, in addition to the original contract price—which itself apparently must have included profits.

Dredge & Dock Co. v. United States, 119 Ct.Cl. 504, 96 F.Supp. 923 (1951), cert. denied, 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708 (1952). The court determined that no excess charges were run up by Moorhead and that its bid was more realistic than the estimate prepared by the City's own engineer. The contractor was obviously confronted with a situation not of its own making, but one induced by the City's delay and failure to prepare the site properly. The total amount expended under these circumstances was reasonably used by the court as a basis for figuring the damage award.

The judgment of the District Court is affirmed.