OMAHA PUBLIC POWER DISTRICT, A NEBRASKA PUBLIC CORPORATION, APPELLEE AND CROSS-APPELLANT, V. DARIN & ARMSTRONG, INC., APPELLANT AND CROSS-APPELLEE.

288 N. W. 2d 467

Filed February 12, 1980. No. 42532.

Gerald P. Laughlin, Michael G. Lessmann, Kirk S. Blecha & Sharon R. Kresha of Baird, Holm,

McEachen, Pedersen, Hamann & Haggart and Robert J. Huck of Delehant, Croker & Huck, for appellant.

Hird Stryker of Fraser, Stryker, Veach, Vaughn, Meusey, Olson & Boyer, P.C., for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

McCOWN, J.

This action arose out of a dispute which occurred during the performance of a construction contract. The contract covered piling, concrete foundation, and steel erection work involved in the construction of a coal-fired electric power plant located near Nebraska City, Nebraska. The proceeding began as an equity action filed by the owner, Omaha Public Power District (district), against the contractor, Darin & Armstrong, Inc. (D & A), for an injunction requiring the contractor to proceed with the construction work after a work stoppage. After granting the injunction, the District Court retained jurisdiction to determine the amount of increased compensation due to the contractor because of a substitution of compacted clay fill for granular fill at the site of the construction project. The District Court entered judgment in favor of the contractor and against the owner in the sum of $1,563,307.75. The contractor has appealed and the owner has cross-appealed.

Prior to 1975, the Omaha Public Power District completed plans and preparations for the construction of a coal-fired electric power generating plant to be built on a site adjacent to the Missouri River in Otoe County, Nebraska. Total contracts for construction exceeded $90 million, and, in addition, contracts for equipment to be incorporated into the plant were in excess of $100 million.

The contract involved here, described as contract

1038, covered work which D & A divided into three separate portions. (1) Drive approximately 2,100 steel pipe piles through approximately 24 feet of fill material and into the soil beneath to a total depth of about 85 feet. The piles were in clusters and were to be filled with concrete after they were driven. This part of the contract also included excavation and backfill work for other portions of the contract. (2) Furnish and pour concrete caps over and tie beams between the various clusters of piles, lay a large concrete circulating water pipe from the river to the plant, and pour a massive concrete thrust block and turbine pedestal. (3) Erect the structural steel for the plant on the pile caps.

The defendant, D & A, was the contractor for all the work under contract 1038, but subcontracted the pile driving and excavation and backfill work described as (1) above to C. J. Rogers Construction Company, and the steel erection work described as (3) above to Midwest Steel Erection, Inc.

Before work under the contract involved here was to begin, the general plans and specifications called for the excavation and removal of the top 24 feet of existing material from the immediate area of the building site and its replacement with a like volume of compacted new material. The advertisement for bids for this site preparation contract requested that bids quote a base price for using cohesive clay material to be taken from the bluffs to the west of the construction site as the fill material, and an alternate price for using granular or sand material dredged from the Missouri River as the fill. Although either type of fill would have provided a suitable foundation, the engineer for the district and the soils engineer preferred and recommended the granular material. Due to the inability of the district to obtain the necessary dredging permits by the required date, the site preparation contract let by the district provided for the use of the cohesive clay fill

rather than the granular fill. That contract was awarded to Eby Construction Company on March 27, 1975, and on April 20, 1975, Eby began work on an around-the-clock schedule, and completed the work on August 15, 1975.

The plans and specifications for the contract involved here were issued on May 6, 1975. Although drafted to cover work on either cohesive or granular fill, the plans and specifications contained no information as to the type of fill that was actually being used by Eby. However, several portions of the test boring log data available to prospective bidders, and prepared by the district's soils consultant, indicated compacted granular fill. The district has conceded that the contractor could have reasonably believed that the top 24 feet of the area in which the pilings were to be driven, and on which the contract work was to be done, would be compacted granular fill rather than compacted cohesive fill.

The engineer's estimate of the cost for contract 1038 was $12,019,000. There were four bidders. D & A was the low bidder with a bid of $8,969,000. The next low bid was more than $1.5 million higher, and the high bid was more than $3 million above the D & A bid. D & A was based in Detroit, Michigan, had not previously bid in the Omaha building trades area, and had not previously had a power plant contract.

Because of the low amount of the bid, the engineering supervisor for the district gave a copy of the engineer's detailed price breakdown to the bid estimator for D & A, and requested him to compare it with their bid to be sure something had not been left out. On July 17, 1975, contract 1038 was awarded to D & A by the district.

Contract specifications for the pile driving were silent on the subject of predrilling. On July 25, 1975, the engineer for the district advised that predrilling for piling would be allowed to a maximum depth of

24 feet, but that the diameter of the holes should be restricted to 10 inches. The piles were 12¾ inches in diameter, although the bottom closure plate of the piles was 13½ inches.

Rogers commenced the pile driving on August 22, 1975. Initial attempts to drive piling without predrilling were unsuccessful and driving piling in 10-inch holes was very difficult, and the clay became "like concrete" when wet. In mid-September 1975, the engineer authorized an increase in diameter of the predrilled holes from 10 inches to 13 inches for 1,800 of the 2,100 piles involved. By late October 1975, Rogers had driven some 900 piles.

The pile driving specifications required that each pile support a design load of 150 tons, and specified 50 blows to the inch under a 30,000 foot-pound hammer as a final driving resistance. There was a reference to a safety factor of 2.5 in some of the provisions dealing with vibratory pile drivers, which were not used on the project. Contract 1038 contains pile load test procedures and requires the contractor to furnish the necessary equipment for testing, keep all records of load and movement of test piles, and bear the cost of pile testing.

In early September 1975, Rogers employed a consulting engineer about the problems that were being encountered in connection with pile driving on contract 1038. The consultant, in a report transmitted to all parties by Rogers, recommended predrilling of the piling holes to any reasonable depth beyond 24 feet, filling the pilings with concrete when partially driven, and completing driving thereafter. His opinion was that under the contract design, many of the piles would not carry the load required under the specifications, and that the final driving resistance specified was well beyond industrial custom and could not be defended.

Rogers and D & A conducted piling compression tests on three test piles, each of which they asserted

failed to show a 150-ton load capacity with a safety factor of 2.5, although the tests showed load capacities of 275, 285, and 288 tons. On October 15, 1975, the engineers for the district were notified by the contractor that the piles could not meet the load criteria in the specifications, and requested that the contractor be given a full waiver of responsibility for being unable to obtain the design loads. On October 23, 1975, the contractor was notified that the district and its engineers had determined that the piles that had been installed were acceptable, with the exception of 12 piles, and would support a design load of 150 tons. The district assumed responsibility for load limits, and ordered the contractor to resume driving piles.

There was extensive discussion and communication between the parties as to pile driving specifications and difficulties. The contractor insisted that specifications for the pile driving be changed, and the district assume all responsibility and liability for load limits relating to the piling, and grant the contractor additional compensation because of the pile driving difficulties encountered. The district responded that the assurances as to load limits requested had already been given, and referred to the contract requirement that the contractor proceed diligently with the performance of the work in accordance with the engineer's orders in such a dispute.

On October 31, 1975, the district was advised that Rogers was ceasing all pile driving operations pending issuance of change orders as to the method of pile driving and test load requirements of the specifications. Rogers discontinued all piling work about November 4, 1975.

On November 19, 1975, the district filed the original petition in this action, seeking an injunction requiring the contractor to resume the pile driving work. A temporary restraining order was issued ordering

D & A to resume work and continue performance of the contract pending subsequent hearing. D & A and Rogers refused to comply with the temporary restraining order, and on December 8, 1975, the district filed a motion to find D & A guilty of contempt, which was later withdrawn.

During the course of the injunction proceedings, the district conceded that the contractor was entitled to anticipate that the top 24 feet of the area in which the piling was to be driven would be compacted granular material rather than compacted cohesive material, and that that change may have had an adverse effect on the contractor's pile driving costs and the time required for the performance of the work. The district assured the court that it had no intention to deprive the contractor of any additional compensation to which it might be entitled under the contract for the performance of the piling work. The district agreed that to the extent the substitution of cohesive for granular material in the fill area increased the contractor's costs of driving the piling to refusal, the district would reimburse the contractor for those costs, together with a reasonable markup to cover overhead and profit.

On December 22, 1975, the District Court entered its order finding that the district had made a substantial change in the contract by substituting compacted clay fill for an approximate depth of 24 feet in lieu of the granular fill originally specified in the agreement, and that a permanent injunction should be granted restraining the contractor from neglecting and refusing to diligently perform the work. The injunction was conditioned on the district's acceptance of a specified condition that the contractor be permitted to preauger a 13-inch diameter hole through the cohesive clay fill. Under the terms of the order the injunction was to be effective upon filing of written acceptance of the condition by the district.

The parties then entered into an agreement that changed the pile driving specifications, set out new preaugering and driving criteria, deleted all testing criteria, and reserved all rights, claims, and remedies each party otherwise had under the contract. The parties then entered into and filed a stipulation with the court which incorporated the agreement, accepted the condition of the injunction, and specifically stipulated: "2. Should the parties be unable to agree on any matters not resolved in said agreement, including, but not limited to, any claims by defendant for alleged extra costs or extra time, it is stipulated that such dispute shall be submitted to this Court for determination after following the procedures set forth in Contract 1038."

Article VI of contract 1038 provided: "DISPUTES-All questions of fact, and any and all disputes with reference thereto arising during the performance of this Contract, and all questions as to the rights and obligations of the Contractor and the District thereunder, and all claims for extra costs or damages incurred in connection therewith, shall first be submitted to the Engineer for decision. That decision, when made in writing, shall be final and conclusive upon the parties hereto, unless thereafter determined by a Nebraska State or Nebraska Federal Court of competent jurisdiction, to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as to necessarily imply bad faith, or not supported by substantial evidence. Pending final determination of any dispute hereunder, the Contractor shall proceed diligently with the performance of the Work in accordance with the Engineer's decision."

In late December 1975, Rogers resumed pile driving operations and completed driving the approximately 1,200 remaining piles by mid-February 1976. Thereafter the project engineer determined that the sum of $369,578.74 was due under the contract for extra work and extra costs involved in the piling work

done by Rogers, and $247,658.63 was due as extra costs incurred by D & A and Midwest Steel in connection with their portions of the contract occasioned as a consequence of pile driving delays. Contract supplements were issued in those amounts and paid.

On September 16, 1976, D & A filed its claim for not less than $2.6 million for the extra work and extra costs involved in the piling and excavation work done by Rogers due to the change in fill material. The claim was based on total costs, less amounts received.

On July 11, 1977, D & A filed its combined claim, which incorporated the Rogers claim and also included claims for extra costs and work allegedly incurred by D & A and Midwest Steel. The claim involved total costs incurred for all segments of contract 1038, plus overhead and profit, less amounts paid by the district. The actual costs claimed were: Rogers $2,905,073; Midwest Steel $4,998,033; and D & A $6,156,891. Overhead and profit were added to those costs to make up the total claim.

The district generally denied the allegations of D & A; alleged that the change in soil conditions did not have a compensable impact on any part of the contract other than the driving of pipe piling; alleged that the costs claimed by D & A were not segregated and were not due to the change in soil conditions; and that no additional amount was due to the contractor beyond amounts already paid.

Trial to the court commenced August 1, 1977. There were 26 days of evidentiary hearings, concluding on January 5, 1978. D & A's evidence was that the change of fill from granular to cohesive clay affected all segments of the work under contract 1038 and greatly increased the costs on the entire project; and that the losses flowing from the change in fill could not be segregated with reasonable certainty. The evidence for D & A developed through

its auditors showed the total expenditures made in the performance of the contract. The costs were separated only as to the work done respectively by Rogers, Midwest Steel, and D & A. They were not separated nor classified otherwise, and there was no attempt to establish that any particular portion or portions of the costs were directly attributable to the change in fill. The contractor's evidence was that the clay peeled off the sides of predrilled holes, matted under the end of the piles, and was like concrete when it was wet; and that the failure of the district to make immediate change orders as to the pile driving delayed the pile driving work which, in turn, delayed all the other work. The evidence was that the work area design for granular fill was in a bowl shape and the substitution of clay for granular fill created a bad drainage situation and created additional work problems for equipment and storage of materials, and reduced labor efficiency. There was evidence that the substitution of clay for granular fill on the piling and backfill operations created a ripple effect which adversely affected Midwest Steel's and D & A's operations, disrupted the performance of those portions of the contract, and adversely affected the efficiency of the working force, as well as creating extensive delay. There was evidence that D & A and its subcontractors were good, efficient contractors, with work forces of average or above average competency. There was also evidence that the customary markup for overhead costs was 10 percent and for profit 10 percent, and an additional 10 percent for the contractor on work done by a subcontractor.

The evidence for the district was that the increased costs were not due to the change in fill, but were due to the contractor's inefficiency and lack of experience, underestimation of the reasonable cost of the work, underbidding the contract, and overestimating the qualifications of its supervisory and

labor forces. The district's evidence was that from a construction cost standpoint the difference in costs between granular and cohesive fill should be minimal for the construction involved here. There was also evidence that the pile driving rigs should have been working on mats, and that if they had been, the type of fill is of no consequence. There was evidence that unit costs and time of performance was excessive and unreasonable, and that costs were increased by delay occasioned by the fault of the contractor. There was evidence that the productivity and efficiency of the contractor's labor force was below average or normal, and that the ability, experience, and efficiency of its supervisory force was inadequate.

Upon completion of the trial, the court took the case under advisement, and briefs were filed. On August 18, 1978, the District Court filed its memorandum opinion and entered judgment. The District Court found that the substitution of cohesive clay for cohesive granular fill material in the construction area was a substantial change in conditions which materially altered the nature and cost of the pile driving and foundational work performed by the subcontractor, C. J. Rogers. The court also found that there was no breakdown of the items of cost, and although a total cost method of calculating damages was not preferred, it was permissible when no other method was feasible and the supporting evidence was substantial. The court then found that the total cost theory should be applied to the work to be performed under the subcontract of C. J. Rogers, but should not be applied to any other portion of the work. The court found that the total costs for the Rogers portion of the contract, as shown by the audit reports, was $2,804,821, from which the court deducted various items of cost of $95,357.56, and found the total allowable costs to be $2,709,463.44. To that figure the court added a markup of 10 percent over-

head and an additional markup of 10 percent profit, making a total amount of $3,278,450.75. From that amount the court subtracted the total payments of $1,843,143 made by the district for the Rogers work, leaving a balance of $1,435,307.75 additional compensation due for the Rogers portion of the work under contract 1038.

The court also found that the district wrongfully deleted $128,000 from the Midwest Steel subcontract portion of contract 1038, and that D & A should recover the total amount deleted. Judgment was therefore entered against the Omaha Public Power District, and in favor of the contractor, Darin & Armstrong, Inc., in the total sum of $1,563,307.75. The contractor has appealed and the district has cross-appealed.

The contractor appellant contends that it should be entitled to recover the total costs expended on all portions of contract 1038, together with overhead and profit, instead of being limited to the Rogers portion of the contract. In essence, the position is that if the change in fill material was a substantial change in conditions which directly and materially affected the nature and cost of the Rogers pile driving work under contract 1038 and justified an equitable adjustment in costs for that work, the change of fill also affected all other portions of contract 1038 and justified an equitable adjustment under the total cost theory for the entire contract.

The total cost method of calculating damages for an equitable adjustment under a construction contract is not preferred, but is permissible when no other method is feasible and the supporting evidence is substantial. The acceptability of the total cost method hinges on proof that: (1) The nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the bid or estimate was realistic; (3) the actual costs were reasonable; and

(4) the contractor was not responsible for the added expenses. See Moorhead Const. Co., Inc. v. City of Grand Forks, 508 F. 2d 1008 (8th Cir., 1975).

It should be noted here that the District Court's memorandum opinion noted that the court struggled with elements (3) and (4) before resolving them in favor of the contractor with respect to the Rogers portion of the contract, and that the court also specifically concluded that a large part of the damages claimed by the contractor with respect to the other portions of the contract were speculative and conjectural as to proximate cause, and that the total cost theory could not be applied to them.

It is a basic concept that in any damage action for breach of contract the claimant must prove that the breach of contract complained of was the proximate cause of the alleged damages. In a breach of contract case there must be a causal relationship between the damages asserted and the breach relied upon. Proof which leaves this issue in the realm of speculation and conjecture is insufficient to support a judgment. Western Land Roller Co. v. Schumacher, 151 Neb. 166, 36 N. W. 2d 777.

In a case involving a contract dispute as to whether an equitable adjustment should have been awarded for damages allegedly stemming from an acceleration order by the owner, this court held: "Damages which are uncertain, conjectural, or speculative as to the existence, nature, or proximate cause thereof are not the basis of a recovery for breach of contract." Siefford v. Housing Authority, 192 Neb. 643, 223 N. W. 2d 816.

Court of Claims cases cited by both parties deal with different theories of damages in construction contract cases, and almost universally hold that recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach. Boyajian v. United States, 191 Ct. of

Claims, 233, 423 F. 2d 1231, and cases there cited.

The evidence as to the causal connection between the additional costs incurred by Rogers, Midwest Steel, and D & A, and the substitution of clay for granular fill is in direct conflict. While the proceedings involve an equitable adjustment of amounts due on a contract, the issues of proximate cause and causal connection; the reasonableness or unreasonableness of costs incurred; and the presence or absence of fault of either party are all factual issues. In an action in equity where the evidence is conflicting and cannot be reconciled, the Supreme Court will consider the fact that the trial court saw and heard the witnesses and their manner of testifying and must have accepted one version of the facts rather than the other. See Stuthman v. Lippert, *ante* p. 302, 287 N. W. 2d 80. In the case now before us the evidence supports the trial court's conclusion that the change of fill was the direct and proximate cause of the increased costs of Rogers, but was not the proximate cause of the additional costs or damages incurred by D & A and Midwest Steel.

Insofar as D & A and Midwest Steel portions of the work are concerned, the evidence is speculative and conjectural and rests on the assumption that because the change in fill affected the Rogers work directly and materially, it caused a "ripple" effect on all subsequent portions of the contract and was, therefore, a material breach of the entire contract authorizing total cost recovery without further proof of causal connection or allocation of fault. We disagree.

In making the equitable adjustment in favor of the Rogers portion of the contract here the District Court based its award upon the application of the total cost theory of damages. This court has followed the rule that a proper judgment will not be reversed because the trial court gave an erroneous

reason for its rendition. See Strauss v. Square D Co., 201 Neb. 571, 270 N. W. 2d 917. That rule has been applied in equity cases as well as in actions at law. See Long v. Magnolia Petroleum Co., 166 Neb. 410, 89 N. W. 2d 245.

Although the trial court in this case announced that it was following the total cost theory with respect to the Rogers work, it nonetheless examined the evidence and deleted virtually $100,000 in costs which the court determined were not causally connected nor supported by the evidence. Even in situations where courts have rejected the total cost method of proving damages, where the record contains reasonably satisfactory evidence of what the damages are, computed on an acceptable basis, the court has adopted such other evidence, at least where the evidence is sufficient upon which to predicate a "jury verdict" award. The Court of Claims has said: "In the past we have allowed so-called 'jury verdicts' if there was clear proof that the contractor was injured and there was no more reliable method for computing damages — but only where 'the evidence adduced [was] sufficient to enable a court or jury to make a fair and reasonable approximation." See WRB Corporation, 183 Ct. of Claims 409, and cases there cited. "In estimating damages, the Court of Claims occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment upon the basis of the evidence provided by the parties." Specialty Assembling Co., 174 Ct. of Claims 153, 355 F. 2d 554.

The District Court indicated its concern with the validity and accuracy of the audited costs in this case because of the fact that the auditors were dependent upon the contractor for supporting material. The court obviously weighed the evidence and eliminated ten separate items of cost totaling more than $95,000 from the Rogers total cost figures. The Dis-

trict Court was entitled to use either the total cost method or a "jury verdict" method in making the equitable adjustment here, and the fact that the method used may have been inaccurately identified is immaterial where the record supports the award. The court's determination of the amount of additional compensation due under the Rogers portion of contract 1038 is supported by the evidence.

It is apparent that the District Court also made a determination of fact, not only that the total cost theory of damages should not be applied to any portion of the work other than the Rogers subcontract, but also determined that a substantial part of the total cost of that work was not due to the change in fill, but was due to the fault of the contractor and his labor force, and that the work stoppages by the contractor were not authorized under the contract and could not be used as a basis upon which to claim damages for increased costs. The determination of the District Court as to D & A and Midwest Steel, although denying any total cost theory of recovery, implicitly approved the additional compensation award of the engineers to D & A and Midwest Steel of $247,658.63, which had already been paid. Those determinations are also supported by the evidence.

The contractor also contends that the District Court erred in failing to award an additional 10 percent allowance for the contractor's profit in addition to the 10 percent profit figure allowed on the Rogers subcontract. The argument is that since the district agreed to pay a reasonable profit on additional costs for the Rogers subcontract, therefore evidence that an additional 10 percent profit for a contractor on a subcontractor's work was usual and customary was sufficient to require the District Court to add such an amount to the 10 percent profit amount allowed in the judgment.

Profits may be included as one of the elements of an equitable adjustment pursuant to the contract

terms. See United States v. Callahan Walker Co., 317 U. S. 56, 63 S. Ct. 113, 87 L. Ed. 49. Reasonable profits may also be allowed as part of an award of damages in a breach of contract action where the damages are granted as part of the original contract price, but those calculated on the excess damage award are ordinarily barred. See J. D. Hedin Construction Co., Inc., 171 Ct. of Claims 70, 347 F. 2d 235.

In an equitable adjustment case such as the one now before us, the allowance of profit is not mandatory but is discretionary, and in an appropriate case profit may be denied altogether, even profit computed on the original contract basis. See Moorhead Const. Co., Inc. v. City of Grand Forks, 508 F. 2d 1008 (8th Cir., 1975).

The usual construction contract equitable adjustment case focuses on actual increased costs stemming from changes in conditions without considering additional profit for the additional work. The allowance which the District Court made here, in addition to the Rogers total adjusted costs, included a 10 percent allowance for overhead in the sum of $270,946.34, and a 10 percent profit allowance on the combined costs and overhead figure in the sum of $298,040.97. In this case the profit award was reasonable and the evidence supports the trial court's determination.

The cross-appeal of the district asserts that the District Court erroneously found that the district wrongfully deleted $128,000 of gallery steel work from the Midwest Steel portion of the contract, and that the entry of judgment for $128,000 as damages for such deletion was erroneous.

During the course of erection of the structural steel by Midwest Steel, the engineer for the district determined that certain gallery steel work, including gratings and handrails in the boiler area which were included in the contract work to be performed by Midwest Steel, should be deferred to facilitate the

installation of a boiler. Negotiations between Midwest Steel and the engineer as to price adjustments were unsuccessful, and the engineer for the district then deleted that steel work from the Midwest Steel portion of the contract, reduced the contract price $127,406.30, and added the work to the boiler company's contract at a price of $140,808. The district's engineer testified that the difference in price reflected the additional costs which the engineer estimated the boiler contractor would incur in performing the work on a second shift, which required night lighting, and in order not to interfere with other contractors on the project, which Midwest Steel had been unwilling to do.

The contract deletion is not covered by the pleadings, nor was there evidence that Midwest Steel did any work or incurred any expenses in connection with the work deleted. Neither was there any evidence as to the amount of any profit which might have been realized from the performance of the deleted work. The court, on its own initiative, determined that the district wrongfully deleted $128,000 from the contract price when Midwest Steel was contractually bound and prepared to erect the deleted steel, but was not allowed to do so. The court also determined that the contractor had suffered damages because of the breach of contract and entered judgment for $128,000 against the district.

Assuming the deletion made was not within the scope of the engineer's authority to make changes under the contract, it is nevertheless clear that the $128,000 judgment relates to a cause of action that was neither pleaded nor argued in the trial of the case. It is elementary that a judgment must be supported by the pleadings. See Swartz v. Peterson, 199 Neb. 171, 256 N. W. 2d 681. Where a contractor is not allowed to complete the performance of a contract, he is entitled to recover the value of the work performed, plus the profit he would have received if

he had been allowed to complete the job as provided in the contract. See Kroeger v. Franchise Equities Inc., 190 Neb. 731, 212 N. W. 2d 348. That case likewise holds that the contractor has the burden of proving the amount of damages with reasonable certainty.

In the case now before us the contractor failed to introduce any evidence that profit in any amount would have been realized if Midwest Steel had been permitted to perform the deleted work. Neither was there any evidence that Midwest Steel had performed any work or incurred any costs attributable to the deleted portion of the work. Even if there had been evidence of some damages, there was certainly no evidence which would permit the recovery of the full contractually computed price for work which was never performed. The contractor's own evidence established that there was a loss on all portions of the Midwest Steel contract rather than a profit. There is certainly no evidence that the deleted portion of the work would have been any different.

That portion of the judgment awarding Darin & Armstrong, Inc., the sum of $128,000 for deletion of the gallery steel work from the Midwest Steel portion of contract 1038 is not supported by the pleadings or by the evidence and cannot be sustained.

The judgment of the District Court is reduced in the amount of $128,000 to the sum of $1,435,307.75, and as thus modified the judgment is affirmed.

AFFIRMED AS MODIFIED.