773 F.2d 960
 3 Fed.R.Serv.3d 958
 NEBRASKA PUBLIC POWER DISTRICT, a Nebraska Corporation and
Political Subdivision of the State of Nebraska, Appellant,
v.
AUSTIN POWER, INC., a Texas Corporation, d/b/a National
Industrial Constructors, Appellee.
Austin Industries, Inc., a Delaware Corporation, Federal
Insurance Company, a New Jersey Corporation.
NEBRASKA PUBLIC POWER DISTRICT, a Nebraska Corporation and
Political Subdivision of the State of Nebraska, Appellee,
v.
AUSTIN POWER, INC., a Texas Corporation, d/b/a National
Industrial Constructors; Austin Industries, Inc., a
Delaware Corporation; and Federal Insurance Company, a New
Jersey Corporation, Appellants.
NEBRASKA PUBLIC POWER DISTRICT, a Nebraska Corporation and
Political Subdivision of the State of Nebraska, Appellant,
v.
AUSTIN POWER, INC., a Texas Corporation, d/b/a National
Industrial Constructors; Austin Industries, Inc.,
a Delaware Corporation; Federal
Insurance Company, a New
Jersey Corporation, Appellees.
 Nos. 84-2420, 84-2473 and 85-1065.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 11, 1985.
Decided Sept. 16, 1985.
 
 Charles W. Surasky, Atlanta, Ga., James J. DeMars, Lincoln, Neb., Thomas E. Abernathy and Philip L. Fortune, Atlanta, Ga., for appellants.
 Gilbert G. Lundstrom, Lincoln, Neb., for appellee.
 Before HEANEY and BOWMAN, Circuit Judges, and WANGELIN,* Senior District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 I. BACKGROUND.
 
 
 2
 Nebraska Public Power District (Nebraska Power), a public corporation and political subdivision of the State of Nebraska, operates an electrical utility system with facilities to generate and transmit electricity. In 1972, Nebraska Power decided to build the Gerald Gentlemen Station (Station), a 650-megawatt coal-fired electric generating plant, near Sutherland, Nebraska. Nebraska Power decided to purchase directly from suppliers all the permanent equipment and materials necessary to construct the Station, and to contract only for the labor and construction equipment to erect the facility. Five companies submitted bids, including Austin Power, Inc. (Austin).[1]
 
 
 3
 Austin was awarded the contract, bidding a total contract target price of approximately $67.8 million, based on an estimated 4.5 million man-hours. The major components of Austin's bid were divided as follows:
 
 
 4
 1. Total Recoverable Costs $47.8 million
2. Fixed Costs $13.2 million
3. Fixed Fee $ 6.8 million
 $67.8 million
 
 
 5
 Austin Industries, Inc. (Austin Industries), Austin's parent company, furnished Nebraska Power with a guarantee agreement to assure Austin's performance. Federal Insurance Company (FIC) issued a performance bond to Nebraska Power to secure Austin's performance.
 
 
 6
 The contract contained an incentive provision which provided that if Austin completed the project for less than ninety-six percent of its target price, it would receive a bonus of fifty percent of the increment below this ninety-six percent figure. The contract also provided that if Austin completed the project for more than 104 percent of its target price, it would be responsible for fifty percent of the overrun above this 104 percent figure.
 
 
 7
 The construction of the Station (projected to take thirty-seven months and 4.5 million man-hours) eventually required forty-eight months and nearly nine million man-hours to complete, resulting in substantial cost overruns. During the course of the project, Nebraska Power paid Austin approximately $17.4 million as its share of the cost overruns pursuant to the overrun sharing provision of the contract. Nebraska Power then filed an action against Austin and Austin Industries sounding in breach of contract, negligence, and misrepresentation. Nebraska Power initially sought in excess of $50 million in damages from Austin, including a refund of the money paid to Austin pursuant to the overrun sharing provision, contending that Austin was primarily responsible for the cost overruns and thus it had been improperly forced to bear fifty percent of the overrun costs. It further contended that it had incurred other substantial consequential costs and damages, including the additional cost of purchasing electricity to meet customer demands during the delay period.
 
 
 8
 Before the case was submitted to the jury, Nebraska Power reduced its claim to $35.6 million. Specifically, it claimed that Austin failed to (1) provide sufficient organization, planning, management and direction of its work force on the project; (2) properly receive and unload materials and equipment furnished by Nebraska Power; (3) store, protect and maintain an accurate inventory of these materials; and (4) establish and maintain a quality control program.[2] Nebraska Power asserted that it was damaged in the following particulars:[3]
 
 
 9
 Austin filed a counterclaim against Nebraska Power, alleging breach of contract and quantum meruit. It sought $55 million in damages,[4] contending that its total cost for performing the contract had increased from $67.8 million to $132.8 million, and that Nebraska Power was responsible for all of the cost overruns. Before the case was submitted to the jury, Austin reduced its damage claim to $31 million. Specifically, Austin claimed that it had incurred the additional costs in erecting the Station due to the following Nebraska Power contract breaches: (1) late and inaccurate construction and installation drawings; (2) lack of construction management services; (3) untimely delivery of material and equipment furnished by Nebraska Power; (4) misfabrication of material and equipment furnished by Nebraska Power; (5) failure to administer the change work provisions of the contract properly; (6) requiring Austin to provide labor not required in the contract without issuing change work orders; (7) failure to coordinate the furnishing of grout for the pulverizers; (8) requiring Austin to erect the steam generator building to conform to a stricter tolerance than required in the contract; (9) failure to pay its share of Craft 68 labor; and (10) failure to unload and properly store materials and equipment delivered before Austin arrived at the construction site.[5] Austin presented its damages for these claims in the following manner:[6]
 
 
 10
 Thus, after a trial that consumed 117 days over a seven-month period, in which ninety-nine witnesses testified, resulting in over 20,000 pages of trial transcript, and in which 6,862 exhibits were received into evidence, the matter went to the jury with Nebraska Power contending it was entitled to a verdict of $35.6 million, and Austin contending it was entitled to a verdict of $31 million.
 
 
 11
 The district court judge submitted Nebraska Power's claims against Austin to the jury on the individual claim theory of recovery. The jury was instructed to determine on which of its nine claims Nebraska Power was entitled to recover damages from Austin, and then to determine from the evidence the total actual damages attributable to these claims. The jury was also instructed to determine whether Nebraska Power was entitled to any consequential damages, and if so, the amount thereof.
 
 
 12
 The court, on the other hand, submitted Austin's claims to the jury on three alternative theories of recovery: the individual claim theory; the total cost theory; and the modified total cost theory. Although the court stated that the individual claim theory was the preferred method, it told the jury that if Austin had established more than one contract breach by Nebraska Power, and no feasible method existed to allocate a specific amount of damage to each breach, the jury could use the total cost method to calculate Austin's damages. If the jury used the total cost method, it was to award Austin the difference between the actual cost incurred in constructing the Station, including reasonable profit, and the amount Nebraska Power had already paid to Austin under the contract. The district court told the jury, however, that it could use the total cost method only if:
 
 
 13
 a. The nature of the particular losses claimed by Austin Power makes it impossible or highly impracticable to determine them with a reasonable degree of accuracy;b. The bid or estimate of Austin Power was realistic;
 
 
 14
 c. The actual cost incurred by Austin Power was reasonable;
 
 
 15
 d. Austin Power was not responsible for the amount sought to be recovered above the amount previously paid under the contract; and
 
 
 16
 e. The costs which make up the amount sought to be recovered were proximately caused by [Nebraska Power's] breaches of contract.
 
 
 17
 Finally, the jury was instructed that if Austin had established elements a, b, c, and e of the total cost theory, but had not established that it was not responsible for any of the amount sought to be recovered, the jury could award damages under the total cost theory, less the amount for which Austin was responsible. This theory was referred to as the modified total cost.[7]
 
 
 18
 In an interrogatory accompanying the verdict forms, the district court required the jury to indicate on which claims it was awarding damages to Nebraska Power and Austin, and which theory it chose to calculate the damages. Because Austin introduced specific evidence with respect to its claims 7 and 11, the district court required the jury to state what amount, if any, it had awarded to Austin on these two claims. Nebraska Power moved for a directed verdict at the close of Austin's case on the grounds that Austin failed to introduce sufficient evidence to enable the jury to determine the precise damages Austin had incurred with respect to each of its thirteen claims. The district court denied the motion and submitted the case to the jury.
 
 
 19
 The jury awarded Nebraska Power damages on four of its nine claims, and returned a general verdict in its favor in the amount of $12 million. The jury awarded Austin damages on ten of its thirteen claims, and, using the individual claim theory of calculating damages, returned a general verdict in favor of Austin in the amount of $26.2 million, specifically awarding Austin $4 million on claim 7 and $1.6 million on claim 11. Both parties moved for a judgment notwithstanding the verdict contending that the other failed to introduce sufficient evidence for the jury to calculate its damages under the individual claim theory. The district court denied these motions, and entered judgment accordingly. After a hearing on the taxation of costs, the district court awarded Austin, as the prevailing party, $787,386 in costs. Both parties appeal.
 
 
 20
 Nebraska Power contends in substance that the district court erred in (1) receiving evidence with respect to Austin's total cost of completing the project and permitting the case to go to the jury on a total or modified cost basis, (2) refusing to direct a verdict in its favor because Austin failed to present sufficient evidence to allow the damages issue to go to the jury on an individual claim basis, (3) permitting the jury to consider Austin's claims for additional profit, home office overhead, and cost of borrowed funds, and (4) incorrectly instructing the jury on Austin's contractual obligation regarding the erection of structural steel for the steam generator building. Nebraska Power also contends that the district court abused its discretion in allowing Austin to recover the cost of expert witness fees as a taxable cost.
 
 
 21
 Austin contends that the district court erred in denying its motion for a judgment notwithstanding the verdict because Nebraska Power presented insufficient evidence to establish the amount of its damages with the required degree of certainty, and to support its recovery for demurrage charges.
 
 
 22
 II. DISCUSSION.
 
 
 23
 A. The Propriety and Method of the District Court's Submission of Damages to the Jury.
 
 
 24
 The basic question at issue in the trial of this action was who was responsible for the delays in constructing the Station, and therefore should bear the resulting cost overruns.[8] Austin presented extensive lay and expert testimony, together with numerous exhibits, indicating that Nebraska Power had breached the contract, was responsible for all of the cost overruns, and detailing the precise amount of these overruns. It accordingly sought to recover all of the additional costs it had incurred in the project. With two exceptions, however, Austin did not attempt to prove the precise amount of damage that resulted from each individual claimed breach.
 
 
 25
 Nebraska Power contended throughout the proceedings that Austin should not be permitted to proceed on a total cost theory of recovery because Austin had failed to meet the prerequisites necessary to proceed under such a theory. Nebraska Power further argued that Austin could not recover on an individual claim basis because it failed to introduce evidence demonstrating the precise amount of damage that occurred from each claimed breach. Although with respect to its claims against Austin, Nebraska Power sought to recover solely on an individual claim basis, Nebraska Power was no more precise in fixing an amount for each individual claim than Austin.
 
 
 26
 Thus, both parties introduced extensive evidence concerning the nature and extent of their damages, but neither party directly related the precise amount of damage to each of its claims. Each now attacks the other for this failure, claiming that the other failed to introduce sufficient evidence for the jury to estimate, with a reasonable degree of certainty, the damage sustained for each claimed breach.
 
 
 27
 Chief Judge Warren K. Urbom, the experienced trial judge who presided over the seven-month trial, decided to submit the damage issue to the jury in the alternative. He instructed the jury that "if the evidence is sufficient to enable you to estimate with a reasonable degree of certainty the actual damages sustained by [the parties] as a result of any claimed breach," the jury could calculate damages using the individual claim theory. Chief Judge Urbom alternatively instructed the jury that "if no feasible method exists to allocate a specific amount of damage to each breach, the total [or modified] cost method may be used to calculate damages." The judge required the jury to indicate on which claims it was awarding the parties damages, and which theory it used to calculate Austin's damages. Because Austin had introduced specific evidence of damages with respect to two of its claims, the jury was also required to indicate what amount, if any, it awarded Austin on these two claims.
 
 
 28
 The jury followed the judge's instructions to the letter. It specifically indicated on which claims it was awarding Nebraska Power and Austin damages, and on which claims it was denying any recovery. The jury also specified that it had used the individual claim theory to calculate Austin's damages. Having carefully reviewed the record, we find no error in the trial court's submission of the damages issue in the alternative, nor in the form of the jury's verdict.
 
 
 29
 Nebraska Power initially contends that Austin failed to meet the prerequisites necessary for proceeding on a total or modified cost theory of recovery, and therefore the district court erred in allowing Austin to present, and the jury to consider, Austin's total cost evidence.[9] Although we have doubts as to the relevancy of this argument, in view of the fact that the jury returned a verdict on an individual claim basis, specifically rejecting the total or modified cost theories, we will consider the argument for two reasons. First, it is the principle argument that Nebraska Power makes on appeal. Second, Nebraska Power claims that the jury may have been impermissibly influenced by the total cost evidence in computing Austin's damages on an individual claim basis.
 
 
 30
 In our view, the district court did not err in permitting the jury to consider using the total cost method to calculate Austin's damages, or in allowing Austin to present its total cost evidence. Nebraska law requires that
 
 
 31
 [t]he acceptability of [using] the total cost method hinges on proof that: (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the bid or estimate was realistic; (3) the actual costs were reasonable; and (4) the contractor was not responsible for the added expenses.
 
 
 32
 Omaha Public Power District v. Darin & Armstrong, Inc., 205 Neb. 484, 496-97, 288 N.W.2d 467, 474 (1980), citing Moorhead Construction Co. v. City of Grand Forks, 508 F.2d 1008, 1016 (8th Cir.1975).
 
 
 33
 Nebraska Power argues that the issue of whether Austin had satisfied these requirements was for the court, and not the jury, to decide. Although the initial responsibility rested with the district court to determine whether there was sufficient evidence to create a question of fact, the district court properly ruled that there was sufficient evidence to raise a question of fact whether Austin could satisfy these requirements and, accordingly, the district court properly submitted the issue to the jury as the trier of fact. Siefford v. Housing Authority of Humboldt, 192 Neb. 643, 223 N.W.2d 816 (1974). Moreover, the district court specifically instructed the jury that it could not use the total cost method to calculate damages unless it found that Austin had carried its burden of proving each of these elements.
 
 
 34
 Similarly, we reject Nebraska Power's argument that the jury was impermissibly influenced by Austin's total cost evidence. Courts that have rejected the total cost method of calculating damages have consistently held that the total cost evidence was probative, and does supply some evidence concerning the reasonableness of costs and damages. E.g., Fattore Co. v. Metropolitan Sewage Commission of Milwaukee, 505 F.2d 1, 6 n. 16 (7th Cir.1974); S.W. Electronics & Manufacturing Corp. v. United States, 655 F.2d 1078, 1089, 228 Ct.Cl. 333 (1981); Omaha Public Power District, 205 Neb. at 499, 288 N.W.2d at 475. Moreover, the jury's verdict indicates that it was able to, and did, use the total cost evidence only as a factor in determining the damages to be awarded for the various delays.
 
 
 35
 Nebraska Power also contends that the district court erred in denying its motions for a directed verdict and judgment notwithstanding the verdict, arguing that Austin failed to present any evidence on the quantum of damages allegedly sustained as a result of the individual breach of contract claims submitted to the jury.
 
 
 36
 The standards for granting a directed verdict and a judgment notwithstanding the verdict are the same under both federal and Nebraska law. Compare SCNO Barge Lines, Inc. v. Anderson Clayton & Co., 745 F.2d 1188, 1192 (8th Cir.1984), with Keystone Bus Lines, Inc. v. ARA Services, Inc., 214 Neb. 813, 816, 336 N.W.2d 555, 557 (1983), and Flynn v. Union Stock Yards Co., 175 Neb. 124, 126-27, 120 N.W.2d 900, 902 (1963). The evidence, together with all reasonable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party, and only when the evidence so viewed points one way and is not susceptible of sustaining the nonmovant's position may the directed verdict or judgment notwithstanding the verdict be granted.
 
 
 37
 Viewing the evidence in accordance with this standard, we believe the district court properly denied Nebraska Power's motions. "It is settled law that once the fact of damage has been established courts are allowed considerable leeway in arriving at the amount of damages." Dean Foods Co. v. Albrecht Dairy Co., 396 F.2d 652, 660 (8th Cir.1968). Nebraska law similarly distinguishes between proof that damages have been sustained, and proof of the amount of those damages. "Where it has been proven that damage has resulted and the only uncertainty is the exact amount, it is sufficient if there is evidence from which the amount of the damages can be ascertained with reasonable certainty." Knoell Construction Co. v. Hanson, 209 Neb. 461, 463, 308 N.W.2d 356, 358 (1981), citing Delp v. Laier, 205 Neb. 417, 288 N.W.2d 265 (1980). Thus, these courts have recognized that the ascertainment of damages is not an exact science, and when the responsibility for damages is proven, "it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision[.]" Electronic & Missile Facilities, Inc. v. United States, 416 F.2d 1345, 1358, 189 Ct.Cl. 237 (1969).
 
 
 38
 Our review of the record indicates that the reasons for the delays and cost overruns were numerous, complex, and interrelated. Austin did, however, present extensive evidence indicating that Nebraska Power was responsible for the delays and overruns. Moreover, Austin presented specific evidence with respect to the damages incurred on two of the thirteen individual contract breaches. It also presented sufficient evidence from which the jury could reasonably fix the damages that Austin incurred on the remaining breaches cumulatively. The district court judge required the jury to specify what amount, if any, it awarded on two contract breach claims for which Austin had submitted specific evidence, but permitted the jury to return a lump-sum award on the remaining claims.
 
 
 39
 The jury obviously followed the court's instructions carefully, and conscientiously considered the matter for over three weeks before returning its verdicts. It made a specific award for the two claims on which Austin had submitted specific evidence, denied any recovery on three of Austin's claims, and awarded a lump-sum on the remaining eight claims for approximately $20.5 million.
 
 
 40
 Similarly, we conclude that Nebraska Power had submitted sufficient evidence to permit the jury to determine its damages on an individual claim basis. Thus, we find that the district court properly denied Austin's motion for a judgment notwithstanding the verdict. The jury determined from the evidence that Nebraska Power should prevail on four of its claims, denying recovery on the remaining five claims, and awarded it approximately $12 million in damages. In our view, the district court's method of submitting the case to the jury was as fair and accurate a method as could have been used, particularly in view of the fact that both parties were claiming that the other was responsible for the delays and cost overruns.
 
 
 41
 "Although the jury system may not provide a means to achieve faultless justice, it is still the best instrumentality our democratic society has devised to decide an adversary proceeding." Chicago, Rock Island & Pacific Railroad v. Speth, 404 F.2d 291, 295 (8th Cir.1968). " 'In estimating damages, * * * all that the litigants have any right to expect is the exercise of the [jury's] best judgment upon the basis of the evidence provided by the parties.' " Omaha Public Power District, 205 Neb. at 499, 288 N.W.2d at 475, quoting Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 573, 174 Ct.Cl. 153 (1966). Having carefully reviewed the record, we believe that there was sufficient evidence for the jury to make a fair and reasonable approximation of the damages Austin sustained on each claim, and that the jury exercised its best judgment in making this approximation.
 
 
 42
 B. Additional Profits, Home Office Overhead, and Cost of Borrowed Funds.
 
 
 43
 Austin included as items of its damage claim a demand for $1.55 million in additional profits, $4.68 million in increased cost of borrowed funds, and a sum for additional overhead costs. Austin did not attempt to allocate a portion of these additional costs to each specific claimed breach but, rather, presented testimony that it had incurred additional costs for each of these items as a result of Nebraska Power's contract breaches, and the resultant delays and cost overruns. It presented evidence detailing the additional costs incurred for each item.
 
 
 44
 At the close of Austin's case, Nebraska Power moved for a directed verdict against Austin on each item. The district court denied the motions. After the jury returned its verdict in favor of Austin, Nebraska Power moved to set aside the verdict, in part, on the grounds that the district court erred in allowing the jury to consider these damage items in computing Austin's recovery. The district court also denied this motion. Nebraska Power renews its objection to the introduction of this evidence on appeal.
 
 
 45
 At the outset, we note that arguably we need not consider whether the district court erred in permitting the jury to consider these items. The jury could have found that Austin had incurred in excess of $17.6 million[10] in damages without ever taking these items of damage into consideration, as the net verdict in favor of Austin was only $14 million. However, because the jury may have considered one or more of these items in arriving at its $26.2 million damage award, we consider Nebraska Power's objections.
 
 
 46
 1. Additional Profits.
 
 
 47
 Nebraska Power contends that the district court erred in denying its motion for a directed verdict on Austin's claim for additional profits. Nebraska Power also insists that the district court erred further in allowing Austin to present evidence of its profit damages based upon a total profit formula, rather than requiring Austin to present evidence of the additional profit earned in relation to each individual breach.
 
 
 48
 In its order denying Nebraska Power's motion for a directed verdict on the issue, the district court stated:
 
 
 49
 [Although] the general rule in Nebraska bars recovery of profits in case of an owner's breach of a construction contract unless they are part of the contract price, the situation is different when the parties have agreed that the contractor should receive additional profits as part of an equitable adjustment where the contractor has performed extra work as the result of a change order, contract amendment, or constructive change. [T]he [Station] contract contains provisions for change work and equitable adjustments.
 
 
 50
 Therefore, Austin Power is entitled to a profit on those items which the jury finds to be change work.[11] In such instances the relevant breach is [Nebraska Power's] failure to adjust the target price to account for the change, including [profit].
 
 
 51
 Nebraska Public Power District v. Austin Power, Inc., No. CV80-L-56 (D.Neb. July 3, 1984) (order denying directed verdicts) (emphasis added).
 
 
 52
 After reviewing the relevant contract provisions, we agree that Austin was contractually entitled to additional profit for changed work. Accordingly, if the evidence was susceptible of supporting a finding that Nebraska Power required Austin to perform additional work without issuing change work orders, it would also support a finding that Austin was entitled to additional profits on that work.
 
 
 53
 Viewing the record in the light most favorable to Austin, there was ample evidence to support Austin's claim that Nebraska Power required Austin to perform additional work without issuing change work orders and, accordingly, that Austin was entitled to additional profits. In fact, at least four of Austin's specific claims, that Nebraska Power failed to furnish materials and equipment free of fabrication errors, that Nebraska Power failed properly to administer the change work provisions of the contract, that Nebraska required Austin to erect the steam generator to conform to a stricter building tolerance than required in the contract, and that Nebraska Power required Austin to perform additional labor without issuing change work orders, directly relate to Nebraska Power's failure to issue change work orders for additional labor. The jury found that Austin should prevail on each of these claims, and specifically awarded Austin $4 million on its claim that Nebraska Power required additional labor without issuing change work orders. The additional profit on this claim alone would exceed $400,000, and the profit on the other mentioned claims would at least equal the remaining $1.1 million in additional profits that may have been allowed by the jury.
 
 
 54
 Nebraska Power further contends that the district court erred in allowing Austin to present, and the jury to consider, evidence of Austin's claim for additional profits based upon the rate of profit that Austin expected to receive on the project as a whole. Austin presented evidence that it originally anticipated a profit of $6.2 million on anticipated costs of $58.4 million, or a profit percentage of 10.53%. The district court, however, did not instruct the jury to use the 10.53% rate in determining the additional profit Austin was entitled to under the change work provisions of the contract. The court simply instructed the jury that if it found that Nebraska Power required additional labor, which should have been classified as change work, Nebraska Power was required to pay Austin for this change work, and that Austin was entitled to a profit for that change work. Furthermore, the district court specifically pointed the jury to the relevant contract provisions to determine the amount of additional profit required for this additional work, and these sections of the contract provided for "[a]n amount for overhead and profit on the Change Work equal to the proportion of Fixed Fee to Total Contract Target Price." Austin's fixed fee ($6.8 million) was slightly more than ten percent of its Total Contract Target Price ($67.8 million).
 
 
 55
 Thus, although it is not entirely clear whether the jury awarded Austin damages for additional profits, or if so, how much, our review of the record indicates that there was a sound basis for such an award, and therefore we conclude that no error was committed.
 
 
 56
 2. Home Office Overhead Costs.
 
 
 57
 The district court denied Nebraska Power's motion for a directed verdict on Austin's claim for additional home office overhead costs. For reversal, Nebraska Power argues that the jury should not have been allowed to consider evidence of such additional costs and asserts that the district court erred in three respects. First, the jury was presented with a dollar figure representing total overhead costs, and this presentation was confusing. Second, Austin was not required to prove that Nebraska Power's breaches caused any increases in Austin's overhead costs. Third, Austin was permitted to utilize the "Eichleay formula" to calculate Austin's additional overhead costs. We find no reversible error in the district court's rulings on these issues.
 
 
 58
 "Failure to make a proper objection constitutes a waiver of error in jury instructions unless the error fits the narrow exception reserved for plain error which would result in a miscarriage of justice if the challenged instruction and verdict were allowed to stand." Denniston v. Burlington Northern, Inc., 726 F.2d 391, 393 (8th Cir.1984), citing Board of Water Works Trustees of Des Moines, Iowa v. Alvord, Burdick & Howson, 706 F.2d 820, 824 (8th Cir.1983). Nebraska Power permitted the total project home office overhead cost figure of $3.8 million to go to the jury without requesting any clarifying instruction setting forth the precise breakdown of the claim. Thus it could be found to have waived the objection it now makes. In any event, expert witnesses, William Palmer and Irving Fogel explained not only how the $3.8 million was calculated, but also testified that the figure represented the total amount of overhead on the project and not the additional home office overhead costs incurred by Austin as a result of Nebraska Power's breaches of contract. Moreover, their testimony gave the jury sufficient information to calculate the additional overhead resulting from Nebraska Power's breaches.
 
 
 59
 Nebraska Power's claim that the district court erred by not requiring Austin to prove that Nebraska Power's breaches caused increases in home office overhead costs is also not supported by the record. Every jury instruction regarding Austin's claims required the jury to find that damages, if any, could be awarded only if they were proximately caused by Nebraska Power's breach. Proximate cause was also properly defined in the instructions. There is, moreover, no merit to Nebraska Power's argument that additional overhead costs are not allowable if the jury award is based on individual breaches. Grand Truck Western R. Co. v. H.W. Nelson Co., 116 F.2d 823, 839 (6th Cir.1941). "In computing damages for breach of a construction contract, overhead expenses may be considered." Grand Truck Western R. Co., 116 F.2d at 839.
 
 
 60
 Nebraska Power finally objects to the use of the Eichleay formula in calculating home office overhead costs. It suggests that, in this case, the use of the formula permitted the jury to award Austin additional overhead costs without the necessity of proving that the additional costs resulted from contract breaches by Nebraska Power. We disagree with Nebraska Power's assertion. The Eichleay formula is simply a recognized method of calculating home office overhead costs. The formula is "an allocation of the total recorded home office expense to the contract in the ratio of contract billings to total billings for the period of performance." Eichleay Corp., ASBCA No. 5183, 60-2 B.C.A., p 2688 at 13,574 (1960). In every instance, a contractor must show that the delays caused its increased overhead costs. That causation was shown here, and therefore we agree with the district court that use of the formula was permissible.
 
 
 61
 Nebraska Power claims that the State Supreme Court would not follow the Eichleay formula. Absent direct Nebraska authority, we give great weight to the district court's interpretation of local law. R.W. Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 821 (8th Cir.1983); Hunter v. United States, 624 F.2d 833, 837 (8th Cir.1980); Bazzano v. Rockwell International Corp., 579 F.2d 465, 469 (8th Cir.1978). We find that the district court's interpretation of Nebraska's law is not "fundamentally deficient in analysis or otherwise lacking in reasoned authority." Ancom, Inc. v. E.R. Squibb & Sons, Inc., 658 F.2d 650, 654 (8th Cir.1981). Accordingly, we affirm the district court's denial of Nebraska Power's motion for a directed verdict on the issue of home office overhead costs.
 
 
 62
 3. Cost of Borrowed Funds.
 
 
 63
 The district court denied Nebraska Power's motion for a directed verdict on Austin's claim for cost of borrowed funds. For reversal, Nebraska Power claims that Austin failed to prove that the interest costs on the borrowed funds were caused by Nebraska Power's breaches of contract, to establish the amount of the loans, and to prove that the loan proceeds were actually used to complete the Station. Nebraska Power also argues that under recent decisions, interest on borrowed funds is not recoverable. See Dravo Corp. v. United States, 594 F.2d 842, 219 Ct.Cl. 416 (1979), and Framlau Corp. v. United States, 568 F.2d 687, 215 Ct.Cl. 185 (1977).
 
 
 64
 In our view, Austin sufficiently established that the loans and interest expenses resulted from the cost overruns. It proved that it borrowed approximately $25 million from its parent corporation, Austin Industries, and used the borrowed funds to meet cost overruns caused in a large measure by the breaches of contract by Nebraska Power. It established that its interest costs for these borrowed funds was $4.7 million. It finally proved that the parent corporation borrowed the $25 million from the Republic National Bank of Dallas, Texas. Thus, William T. Solomon, President of Austin Industries, testified that approximately $25 million was taken out in loans to cover the cost overruns on the Station project. Henry Kelly, controller of Austin, testified in detail that Austin experienced a negative cash flow caused by the delays and cost overruns in completing the Station, and that it was necessary for Austin to borrow $25 million from its parent, Austin Industries, to cover this shortage. William Palmer testified that the parent, in turn, borrowed the funds to meet this commitment from the Republic National Bank. Palmer further testified that "[t]he cost of borrowed funds and the having to borrow money was directly the result of the loss on this project." He supported his opinion with a lengthy analysis showing the casual relationship between the delays on the project and the borrowings.
 
 
 65
 Neither party cites to a Nebraska case addressing the question of when recovery for the cost of borrowed funds will be permitted, but we give great weight to the district court's holding that the state courts would be receptive toward allowing full compensation for actual damages arising from contract breaches. This view is supported by cases from other jurisdictions. See New Amsterdam Casualty Co. v. Mitchell, 325 F.2d 474 (5th Cir.1963) (applying Georgia law); Cal-Val Construction Co. v. Mazur, 636 S.W.2d 391 (Mo.App.1982); Roanoke Hospital Association v. Doyle & Russell, Inc., 215 Va. 796, 214 S.E.2d 155 (1975).
 
 
 66
 Nebraska Power has directed this Court to Dravo Corp. v. United States, 594 F.2d at 846-49, which followed Framlau Corp. v. United States, 568 F.2d at 693-95, in holding that "direct tracing to a specific loan or necessity for increased borrowing is still required to be proven in order for a contractor to recover for interest costs under an equitable adjustment theory." We find no conflict between the decision in the cited cases and the decision of the district court and this Court in the instant case. The Court of Claims simply held in both cases that it would not permit compensation for imputed interest for the use of more equity capital than had been intended, but it would allow interest costs where the contractor paid the interest and the borrowing was necessary. Here, both conditions were met.
 
 
 67
 C. Steam Generator Tolerance Specifications.
 
 
 68
 The jury held for Austin on its claim that Nebraska Power required Austin to erect the vertical steel members of the steam generator building to conform to a stricter tolerance specification than required in the contract.[12] Nebraska Power challenges this verdict, arguing that the district court erroneously interpreted the tolerance provisions of the contract, and therefore instructed the jury incorrectly concerning the tolerance specifications for the steam generator building. After carefully reviewing the contract, we conclude that the district court's interpretation was correct, and the jury instruction proper.
 
 
 69
 The district court instructed the jury that "[t]he contract specified that [the steam generator] steel be erected in accordance with the American Institute of Steel Construction, Inc. (AISC) Standards." The AISC standards provided that vertical members of a multistory building are considered plumb if they deviate laterally less than one inch from center for every 500 inches they extend vertically (1:500). Nebraska Power contends that although the contract provided that tolerances may generally conform to AISC standards, it specifically required that all vertical members be erected plumb to a tolerance not exceeding 1:1000, rather than the AISC 1:500 standard. Therefore, Nebraska Power argues that the district court's jury instruction was erroneous, and, accordingly, Austin should not recover damages because Nebraska Power only required Austin to erect the steam generator building as required in the original contract, and not in a materially different or more costly manner.
 
 
 70
 Nebraska Power bases its argument upon paragraph G.II.B.9.j(5) of the contract, which provides in pertinent part:
 
 
 71
 After assembly, the various members forming parts of a completed frame or structure shall be accurately plumbed, aligned and adjusted before being permanently fastened. Tolerances shall conform to the AISC "Code of Standard Practice for Steel Buildings and Bridges," except that vertical members shall be erected plumb to a tolerance not exceeding one to 1000, or a maximum of one (1) inch at the member center line.
 
 
 72
 However, the district court properly recognized that the introductory language of paragraph G.II.B.9 specifically exempted the steam generator building from the above provision. Paragraph G.II.B.9.a(4) provides:
 
 
 73
 This Paragraph covers and shall be applicable to all work of this contract associated with the erection and installation of structural and miscellaneous steel and related items, except for certain related work specified in the following Paragraphs of this Section.
 
 
 74
 * * *
 
 
 75
 * * *
 
 
 76
 (4) Steel furnished as part of mechanical equipment packages is specified in Paragraph [G.II.]C, MECHANICAL. [Emphasis added.]
 
 
 77
 Paragraph G.II.C (Mechanical), subparagraph 2.c(4), entitled "Steam Generator and Accessories," provides that "[t]he Steam Generator package will include all structural and miscellaneous steel * * * necessary to construct and erect the unit and all accessory equipment." (Emphasis added.)
 
 
 78
 Because the contract contained a provision specifically related to the steam generator building, we conclude that the building was exempted from the general structural and miscellaneous steel paragraph, and, in particular, the general tolerance provision in paragraph G.II.B.9.j(5). See State v. Commercial Casualty Insurance Co., 125 Neb. 43, 248 N.W. 807, 810 (1933) (where general and specific provisions in construction contract relate to the same subject, the special provision controls over the general). Furthermore, even if there were some uncertainty as to the meaning of the various provisions, Nebraska Power prepared the contract, and any question as to its meaning will be construed against it. See, e.g., Baltes v. Hodges, 207 Neb. 740, 745, 301 N.W.2d 92, 96 (1981); Timmerman Bros., Inc. v. Quigley, 198 Neb. 129, 132, 251 N.W.2d 877, 879 (1977). Hence, we find that the district court correctly held that the AISC 1:500 tolerance specifications applied to the steam generator building, and that its jury instruction to that effect was proper.
 
 
 79
 D. Demurrage Charges.
 
 
 80
 The district court denied Austin's motion for judgment notwithstanding the verdict on Nebraska Power's claim for recovery of demurrage charges. For reversal, Austin claims that Nebraska Power failed to present sufficient evidence to support a recovery of demurrage charges. The parties' dispute rests entirely upon the record. In short, the questions are whether or not Nebraska Power has furnished sufficient data from which the amount of its damages can be ascertained with reasonable certainty, Knoell Construction Co. v. Hanson, 209 Neb. 461, 308 N.W.2d 356 (1981); Roberts Construction Co. v. State, 172 Neb. 819, 111 N.W.2d 767 (1961), and whether or not Nebraska Power's demurrage costs were proximately caused by Austin's failure to unload district-furnished materials.
 
 
 81
 We agree with the district court that there is sufficient evidence in the record to support the jury's finding. The evidence presented by Nebraska Power through the testimony of Edward H. Campbell, Stears-Roger's resident engineer, and Sam Peterson, Nebraska Power's assistant site manager, together with several exhibits (Exhibits 696, 46D30, and 175A394) provided the jury with sufficient evidence to find Nebraska Power suffered demurrage damages as a result of Austin's actions. We do not find, nor do we need to find, that the evidence presented conclusively establishes Nebraska's claim. Michael Todd & Co. v. Lacal Co., 583 F.2d 1056, 1058 (8th Cir.1978).
 
 
 82
 Upon a review of the record, we find sufficient evidentiary support for the jury to have concluded that Nebraska Power suffered demurrage damages as a result of Austin's contractual failures with respect to its duty to unload district-furnished materials so as to avoid incurring demurrage costs. Thus, we agree with the district court in its denial of Austin's motion for judgment notwithstanding the verdict on the issue of demurrage charges.
 
 
 83
 E. Expert Witnesses' Fees.
 
 
 84
 The district court held that Austin, as the prevailing party, was entitled to recover its costs. Austin filed a detailed itemized bill of costs with the district court clerk, and after a hearing, the clerk taxed Austin's costs to Nebraska Power in the amount of $799,580.45. Included in this amount were fees paid by Austin to two expert witnesses. Nebraska Power appealed this determination, and the district court held a hearing on Nebraska Power's motion to reassess costs. The court excluded $2,194 in costs for witnesses who were Austin employees, but otherwise affirmed the clerk's award of costs, including the fees for Austin's expert witnesses, finding that
 
 
 85
 [t]he testimony of each was crucial to the resolution of the case, both to the establishment of causation and nature of the damage and the understanding by the jury of the significance of weeks of testimony by nonexpert witnesses. This is true, even though the jury did not accept all of [their] opinions[.]
 
 
 86
 We find no error in the taxation of expert witness costs to Nebraska Power. The traditional rule under 28 U.S.C. Sec. 1821 has been to limit recovery for expert witness fees to the statutory allowances for attendance, mileage, and subsistence. E.g., Ramos v. Lamm, 713 F.2d 546, 559 (10th Cir.1983); Kivi v. Nationwide Mutual Insurance Co., 695 F.2d 1285, 1289 (11th Cir.1983). This Court has awarded expert witness fees, however, under Fed.R.Civ.P. 54(d) if, after carefully scrutinizing the prevailing party's bill of costs, the district court determines that the expert's testimony was crucial to the issues decided and the expenditures were necessary to the litigation. Hiegel v. Hill, 771 F.2d 358, 360 (8th Cir.1985); Nemmers v. City of Dubuque, 764 F.2d 502, 506 (8th Cir.1985); Coleman v. City of Omaha, 714 F.2d 804, 809 (8th Cir.1983).
 
 
 87
 In accordance with this standard, we conclude that the district court properly found that the experts' testimony was crucial to the resolution of the issues in this case. Because the case was tried to a jury, it is difficult to determine with absolute certainty the degree to which the verdict was dependent upon the experts' testimony. However, this is typically "a matter to be determined by the district court based on its familiarity with the case and in the exercise of its reasoned discretion." Coleman, 714 F.2d at 809. The district court found that the experts' testimony was crucial not only to the questions of causation and damages, but also to the jury's understanding of the significance of other nonexpert testimony. Reviewing the voluminous record in this case, we conclude that this finding is not clearly erroneous, and that the district court did not abuse its discretion in awarding costs for Austin's experts.
 
 
 88
 We have also carefully reviewed Austin's detailed bill of costs and find that these costs were reasonable. Furthermore, the district court's review of this itemized and detailed bill of costs reflects the proper kind of close scrutiny required in this type of case. Accordingly, we affirm the district court's award of $797,386.45 in taxable costs.
 
 
 89
 III. SUMMARY.
 
 
 90
 The district court was confronted with a case in which there had been substantial delays and massive cost overruns. Each party contended that the other was responsible for the delays and the additional costs resulting therefrom. Extensive lay and expert testimony was introduced by each party in support of its contentions. The parties presented over 6,000 exhibits in support of their position. At the close of the evidence, the trial court held a lengthy jury instruction conference in an attempt to reconcile the differences between the parties. In the end, the court had no choice but to submit the case to the jury in a manner that it thought would permit the jury to determine relative fault in accordance with the applicable legal standards. The jury conscientiously considered the matter for over three weeks, and rendered a net award to Austin in the sum of $14 million. Both parties made judgment notwithstanding the verdict motions, and these were denied by the district court.
 
 
 91
 A careful review of the record has convinced us that this case was carefully and thoroughly tried by the district judge, who made no reversible errors of law. We are further convinced that the jury rendered a verdict substantially in accord with the evidence. We thus affirm. The costs of this appeal will be taxed to Nebraska Power.
 
 
 
 *
 The Honorable H. Kenneth Wangelin, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation
 
 
 [1]
 Austin Power, Inc., is the successor company of National Industrial Constructors, Inc., which submitted the original bid and was awarded the contract. Austin Industries, Inc., is the parent corporation of Austin Power, Inc., and was the parent corporation of Industrial Constructors, Inc
 
 
 [2]
 These are the four claims on which the jury awarded Nebraska Power damages. In a special interrogatory accompanying the verdict, the jury specifically disallowed any recovery on the following five claims: Austin failed to (1) provide a sufficient number of experienced and skilled workers; (2) provide a sufficient number of appropriate and properly maintained tools and equipment; (3) prepare "as-built" drawings; (4) schedule work properly; and (5) provide a safety program to ensure compliance with federal, state, and local rules and regulations
 
 
 [3]
 The numbers assigned to Nebraska Power's claims bear no relationship to the numbers assigned to the particular items listed in Nebraska Power's damages summary
 SUMMARY OF NEBRASKA POWER'S DAMAGES (Exhibit No. 2472)
Item # Description Overrun Delay Total
 1 Increased Labor Escalation paid
 by NPPD to NIC $ 3,031,549 $1,949,675 $ 4,981,224
 2 Premium time paid to NPPD to
 NIC 0 0
 3 Overrun costs paid by NPPD to
 NIC $13,244,594 $13,244,594
 4 Costs incurred by NPPD as a
 result of poor NIC workmanship $ 630,896 $ 630,896
 5 Increased material costs paid by
 NPPD as a result of NIC's
 loss, waste, or misuse of
 NPPD-supplied materials $ 1,155,489 $ 1,155,489
 6 Costs incurred by NPPD to
 perform NIC'S
 contractual obligations $ 444,921 $ 444,921
 7 Escalation costs of fuel,
 materials and labor incurred
 by
 NPPD as a result of NIC's
 delay to project completion $ 248,205 $ 248,205
 8 Increased engineering,
 construction
 management and construction
 power costs as a result
 of NIC's delay to project
 completion $ 513,619 $ 513,619
 9 Increased vendor costs paid by
 NPPD as a result of NIC's
 inexperience and delay to
 project completion $1,316,084 $ 1,316,084
 10 Increased insurance costs paid
 by NPPD as a result of NIC's
 manhour overrun and delay to
 project completion $ 251,452 $ 243,853 $ 495,305
 11 Impact aid to schools $ 899,706 $ 899,706
 -------------------------------------
 $19,658,607 $4,271,436 $23,930,043
 12 Increased interest on bonds paid
 by NPPD to finance the
 construction cost overrun
 caused by NIC $11,692,479 $11,692,479
 -------------------------------------
 $31,351,086 $4,271,436 $35,622,522
 
 
 [4]
 In its initial counterclaim, Austin sought $32.7 million in damages from Nebraska Power. However, in its pretrial brief, Austin increased its claim to $55 million
 
 
 [5]
 The jury awarded Austin damages on ten of its thirteen claims, specifically denying any recovery on Austin's claims that Nebraska Power failed to (1) relocate the Station as promised in the contract, and (2) provide access to the area under the jurisdiction of the Federal Power Commission to construct cooling water structures. The jury also denied recovery for prejudgment interest
 
 
 [6]
 Similar to Nebraska Power's damage summary, the numbers assigned to Austin's individual claims bear no relationship to the numbers assigned to the particular items listed in the damage summary
 SUMMARY OF AUSTIN'S DAMAGES (Exhibit No. 180 A 123)
Project Cost Incurred
---------------------
1. Recoverable Labor $84,855,282
2. Subcontracts $13,494,688
3. Employee Move in Costs
 (Relocation) $ 207,975
4. Fixed Costs $13,637,297
4a. Project Costs Included in Fee $ 782,499
 -----------
5. Total Project Costs $112,977,741
Additional Costs
----------------
6. Unresolved Subcontractor Claims $ 580,747
7. Home Office Overhead Costs $ 3,843,475
8. Cost of Borrowed Funds $ 4,676,000
 -----------
9. Total Additional Costs $ 9,100,222
 ------------
10. Total Costs for Purposes
 of Litigations $122,077,963
Profit and Interest
-------------------
11. Reasonable Profit $ 8,053,081
12. Prejudgment Interest $ 3,366,186
 ------------
13. Total Cost and Interest $133,497,230
Payments and Adjustments
------------------------
14. Amount Paid by NPPD $102,371,018
 ------------
15. SUBTOTAL $ 31,126,212
16. Costs NIC Agreed to Absorb $ 98,451
 ------------
Claimed Entitlement
-------------------
17. Claim Entitlement by NIC $ 31,027,761
 
 
 [7]
 Nebraska Power made a motion in limine to prevent Austin from proceeding under the total or modified cost theory of recovery, arguing that Austin had failed to establish the prerequisites for proceeding under either theory. The district court denied this motion
 
 
 [8]
 Counsel for Nebraska Power opened his closing argument with the following statement: "Based on [the] evidence, you are going to have to allocate the responsibility for the approximately 30 million dollar overrun[.]" (Tr. 20,349). Counsel for Austin similarly stated, "I think the basic question that you have to ask yourself is who is responsible for this large overrun, time, manhours and dollars in order to get this project done." (Tr. 20,643)
 
 
 [9]
 Nebraska Power first raised this issue by a motion in limine in which it requested the district court to prohibit Austin from introducing evidence at trial to establish the amount of damages alleged in Austin's counterclaim against Nebraska Power under a total cost theory of proving damages. The district court denied this motion in a written memorandum and order stating:
 Nebraska law clearly allows the factfinder to consider evidence under the total cost theory, to apply the theory if the facts established the existence of the four elements from Moorhead Construction, or, if elements of the damages claim are not supported by the evidence, to whittle away those items not proximately caused by the owner's breach.
 
 
 [10]
 This $17.6 million figure represents Austin's claim when these three items, plus Austin's claim for prejudgment interest which the jury specifically disallowed, are subtracted from Austin's total $31 million claim
 
 
 [1]
 Total Claim $31.0 million
 a. Additional Profits $1.5 million
 b. Home Office Overhead $3.8 million
 c. Cost of Borrowed Funds $4.7 million
 d. Prejudgment Interest $3.4 million
 ------------
2. Total $13.4 million
 -------------
3. Balance $17.6 million
 
 
 [11]
 "Change work" was defined as work not included in the total contract target price
 
 
 [12]
 Austin had contended that the change in tolerance specifications required it to construct the steam generator building in a materially different and more costly manner than originally contracted